IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MASTERS V. MASTERS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LISA M. MASTERS, NOW KNOWN AS LISA M. WYMAN, APPELLANT,

V.

ANDREW G. MASTERS, APPELLEE.

Filed May 21, 2024.    Nos. A-23-745, A-23-746.

Appeals from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Matthew Stuart Higgins, of Higgins Law, for appellant.

James M. Buchanan, of James M. Buchanan, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Andrew G. Masters and Lisa M. Masters, now known as Lisa M. Wyman, were divorced in August 2017. The divorce decree entered by the Douglas County District Court awarded the parties joint legal custody of their son, with physical custody awarded to Lisa. In January 2023, the district court entered a modification order that divided specific legal custody responsibilities between the parties and granted them joint physical custody. Within 6 months thereafter, Lisa filed a contempt action against Andrew for various alleged violations of the modification order. Following the contempt hearing, the court entered two orders. In one order, the court found that Andrew was in contempt of some, but not all, violations alleged by Lisa. In a separate order, the court determined it was in the child's best interests that the transportation provision contained in the modification order be "clarified to avoid any further conflict."

- 1 -

In case No. A-23-745, Lisa appeals from the district court's contempt order. Lisa also challenges the court's decision to award her only $300 towards her attorney fees.

In case No. A-23-746, Lisa appeals from the district court's separate order that clarified the transportation provision contained in the modification order.

We previously ordered the consolidation of both appeals for disposition. Finding no abuse of discretion in either case, we affirm case No. A-23-745 and case No. A-23-746.

## II. BACKGROUND

### 1. 2017 DIVORCE DECREE

The district court entered a decree dissolving the parties' marriage in August 2017. Based on the parties' mediated parenting plan and agreed upon addendum, the court awarded the parties joint legal custody of their son, born in 2013, and awarded Lisa primary physical custody, subject to Andrew's parenting time. Pursuant to the parenting plan, Andrew was to have regular parenting time for certain hours on specific days, including holidays. Additionally, the parties' son was to continue seeing his therapist, and Andrew was not to exercise overnight parenting time until recommended in writing by that therapist.

### 2. 2023 MODIFICATION ORDER

On December 26, 2018, Andrew filed a complaint to modify the decree, alleging there had been a material change in circumstances in that: both parties' circumstances had changed; Lisa routinely failed to follow the parenting plan, especially regarding legal custody and parenting time; Lisa made decisions detrimental to the child's wellbeing; Lisa refused to communicate regarding the child; and the child attained an age where the current parenting plan was no longer in his best interests. Andrew asked the court "for an Order reevaluating child custody, parenting time and support based on the [parties'] new parenting arrangement."

Following a 3-day trial in October and November 2022, the district court entered its order of modification on January 23, 2023. The court found that Andrew met his burden to prove that a material change in circumstances had occurred that affected the best interests of the child and justified a modification of custody, the parenting plan, and child support. The court observed that the "parties have exhibited an inability to co-parent," pointing out Lisa's unilateral action to discontinue the child's therapy when the therapist was recommending overnight and increased parenting time for Andrew, and Andrew's "inability to notify" Lisa about appointments. The court was troubled by Lisa's repeated claims of child abuse and sexual abuse to law enforcement and others, and despite each allegation being investigated and determined to be unfounded, Lisa refused to accept the opinions of several therapists who opined that the child's claims were false. There was evidence the child would say things to please his mother.

As relevant to the current appeals, the district court awarded Andrew sole legal custody of the child as to medical decisions (including therapy, optical, dental, and mental health), school, and extracurricular activities that involve a sport, and the court said Andrew "shall communicate with [Lisa] before decisions are made." Lisa was awarded sole legal custody as to "religion and extracurricular activities that involve music or non-sport activities," and she "shall communicate with [Andrew] before decisions are made." "Both parties shall allow and assist the minor child in participating in activities regardless of who the child is with at the time of such activities, practices,

- 2 -

appointments, etc." The parties were granted joint physical custody of the child, subject to an attached parenting plan. Pursuant to the attached parenting plan, Andrew was to have parenting time "every Monday when the child is dropped off at school, or 9 a.m. until Wednesday when the child is dropped off at school or 9 a.m." Lisa was to have parenting time "every Wednesday when the child is dropped off at school, or 9 a.m. until Friday when the child is dropped off at school or 9 a.m." The parties had alternate weekends "starting on Friday when the child is dropped off at school, or 9 a.m. until Monday when the child is dropped off at school or 9 a.m." Holiday parenting time was also established.

The attached parenting plan also included the following language relevant to the current appeals:

> That it is in the best interest of the minor child that the parties:
> **A. ACKNOWLEDGMENT**
> . . . .
> 5. Set forth the authority and responsibilities of each party with respect to the minor child[;]
> 6. Minimize the child's exposure to harmful parental conflict;
> . . . .
> 8. Encourage mutual appropriate participation by both parties in the minor child's activities.
> . . . .
> 13. Mother and Father shall discuss issues relating to their child to include health and medical issues, social issues to include their child's friends, school issues to include school related problems and decisions, and any behavioral or disciplinary issues which could impact both households. . . .
> 14. . . . The names of each parent shall appear on all medical and school records and the Mother and Father shall keep the other informed of the current telephone number and address of the child's schools and health care providers. Each parent is responsible for notifying the school that he or she is to be included on mailing lists and be notified of conferences and events, provided report cards, progress notes and other pertinent information.
> 15. . . . Each parent will provide the other parent with information related to educational achievements and deficiencies of the child.
> . . . .
> **E. TRANSPORTATION**
> Transportation will be provided by Defendant Dad.
> **F. COMMUNICATION**
> . . . .
> The Mother and Father shall inform one another by email of the child's extracurricular activities and school events in which parents may participate or observe to include but limited [sic] to school plays, teacher conferences, sporting events, religious events, music or dance recitals, and any other activities. . . .
> . . . .

**I. ACTIVITIES**

Each parent shall inform the other of the child's social and extra-curricular activities so that both parents may participate where possible and appropriate no matter which parent is exercising regular parenting time. The parties agree that all extracurricular activities for the minor child, including but not limited to sports, musical activities, religious activities, dance, birthdays or hobby-related activities, shall be discussed between the parents. Each party shall consult with the other regarding activities and shall keep the other informed regarding practices, games, recitals or other special events.

The parents will insure [sic] that the minor child attends practices, lessons, performances, etc. regardless of who is exercising parenting time so the child can have consistent attendance at his activities.

**J. INFORMATION**

Both parents shall be entitled to full and complete medical and educational information about the minor child. Such information shall be available to each parent without notice to or further consent of the other. Each parent shall execute any releases, waivers, or other documents that may be necessary to enable the other to enjoy these rights.

a. Medical Information: *Copies of medical and dental records and authorizations for reports from physicians, dentist, and other health care providers*: The names of both parents shall appear on the records of the child's physicians, dentists, and other health care providers of the minor child, so that both parents shall receive copies of medical and dental records, and other records pertaining to the health care of the minor child. . . .

b. Educational Information: *Education of the minor child, report cards, notices of open houses, notices of parent/teacher conferences and notice of school programs*: The names of both parents shall appear on the records of the educational institutions being attended by the minor child so that both parents shall receive copies of report cards, notices of open houses, notices of parent/teacher conferences, and notices of school programs. Each parent is responsible for notifying the school that he or she wishes to be included on the mailing list and be notified of conferences and events, as well as receiving copies of report cards, progress reports and all other pertinent information.

. . . .

(Emphasis in original.)

Lisa appealed the district court's modification order, assigning numerous errors. This court affirmed the modification order, and Lisa's petition for further review was denied by the Nebraska Supreme Court. See *Masters v. Masters*, case No. A-23-111, 2024 WL 160117 (Neb. App. Jan. 16, 2024) (selected for posting to court website) (petition for further review denied March 28, 2024).

3. CURRENT CONTEMPT ACTION

(a) Allegations of Contempt

Within 6 months of the district court's January 2023 modification order, and while her appeal from that order was pending in this court, Lisa filed an "Affidavit and Application for an Order to Show Cause," alleging that Andrew violated the modification order and attached

parenting plan. As relevant to this appeal, Lisa alleged that Andrew: was not "ensuring that our son attends church each Sunday he has parenting time"; did not "properly inform Boys Town that I was my son's mother," resulting in Lisa having to verify that fact before they would release medical information to her; was refusing to provide transportation for their son as required; had signed their son up for "extracurricular non-sport activities," specifically, "Ashbury Kid's Club"; and had not informed Lisa of a meeting Andrew and his wife had with the principal of their son's elementary school regarding issues between their son and another student at school.

The district court entered an order directing Andrew to appear before the court and show cause why he should not be found in contempt of the court's order.

### (b) Contempt Hearing

The contempt hearing was held on August 22, 2023. Andrew, Lisa, and one other witness testified, and exhibits were received. The evidence relevant to this appeal follows.

### *(i) Religion and Extracurricular Activities*

Lisa claimed that Andrew violated the provision of the January 2023 modification order granting her sole legal custody of the child regarding religion and extracurricular activities not involving sports, and requiring both parties to allow and assist the child in participating in activities regardless of who the child is with at the time of such activities.

### a. Church

According to Lisa, "[c]hurch is an activity." She said their son "likes to go to church on Sunday" and in the past attended church every Sunday, but Andrew will not take their son (or allow Lisa to take their son) to church during his parenting time. On cross-examination, Lisa noted that she takes her son to his sports (all scheduled by Andrew) during her parenting time. However, she does not take her son to his sport's practices on Wednesday nights because "[w]e are at church."

Andrew acknowledged that Lisa has legal custody as to religion but said that he did not consider church "an activity."

### b. Kids Club

Lisa also found out that Andrew signed their son up for activities though Ashbury Kids Club. Lisa testified that "other than [Andrew] actually sending me the bill to pay my portion [after our child participated], I was not informed." Lisa said that exhibit 172 is a copy of the bill she received and is her "proof where [Andrew] is signing [our son] up for activities that are non-sports related." Exhibit 172 is an "Invoice" to Andrew dated February 21, 2023, from "Ashbury Kids Club" and shows a $25 charge for "School Year Registration Fee" and a $50 charge for "Summer Activity Fee."

The district court asked Lisa if the Ashbury Kids Club was "after school, like a -- essentially like a daycare for school." Lisa stated that it is "located at the school," "[a]t least the school year part, the summer activity fee, they do activities all summer, so I don't know all the details with that." On cross-examination, Lisa acknowledged that the activities were done through the Kids Club. When asked if she had any issue with the activities that her son participated in at

Kids Club, Lisa replied, "I don't know what all of them are," but the "few that I do know of, no, I did not have an issue with."

Andrew testified that Kids Club was a daycare that their son attended during his parenting time. The "activity fee is to cover any expenses [for trips] that the children at Kids Club may take throughout the summer," such as trips to splash pads or the zoo.

*(ii) Meeting With Principal*

Lisa testified that she was not informed about a meeting, initiated by Andrew, that he and his wife had with the school principal regarding an incident involving the parties' son and another student. After Lisa found out that the meeting occurred, she asked Andrew about it, and he told her it involved "a girl in the neighborhood and tried to imply that it . . . was more of a neighborhood issue." Lisa then referred to her "WhatApp" messages with Andrew, found in exhibit 170, to confirm that the school meeting took place. The relevant excerpt from the exhibit is as follows:

> [5/11/23, 1:20:10 PM] Lisa Wyman: Did you and [your wife] have a visit with anyone at [our son's] school last week? If so is there anything I should be aware of?
>
> [5/11/23, 3:12:31 PM] Andy Masters: It was a visit with the principal to get an idea of what is going on with [our son] and [a named girl]. It has caused some issues in the neighborhood and I just wanted to know was [sic] happening other than what [the girl's] dad has been saying.

(Brackets for date and time in original.) When asked if she knew what Andrew meant by "'trouble [sic] in the neighborhood,'" Lisa said that Andrew had shared with her that their son was not allowed on the neighbor's property and the neighbor would watch to make sure that he did not go on the property; their son got yelled at for retrieving a ball from the neighbor's yard (he had to climb a fence). Lisa stated that the parties' son has "had a problem with this [girl] in particular for a good majority of the school year."

Andrew testified that he requested the meeting because he had "several phone calls" with the principal prior to that about their son's behavior and Andrew wanted to "understand what's going on because this has spilled over into our neighborhood"; the meeting was related to issues in the neighborhood, not just at school. Andrew said, "I didn't think [Lisa] had any reason to be there for an issue going on in my neighborhood." Andrew had spoken to the girl's father and Andrew wanted to know if it "was a one-sided thing or if both students were agitating each other."

*(iii) Transportation*

The parenting plan attached to the modification order states, "Transportation will be provided by [Andrew]." This language was carried over from the original stipulated decree. Lisa's position was that this language required Andrew to pick their son up from Lisa's house to take him to school on transition days even though the child was concluding his parenting time with her. According to Lisa, there were no issues in this regard during the summer, just the school year. Andrew testified, "I wasn't aware I had to pick up [our son] on Lisa's parenting time." Andrew responded affirmatively when asked if the transportation provision caused some confusion between him and Lisa.

### (iv) Medical Records

Lisa testified that on April 19, 2023, she took their son to his appointment at Boys Town, and when they checked in, she learned that "they didn't have any of my information." Lisa said she was told she needed to "provide the modification" to prove that she was the child's mother, "[s]o I did prove that to Boys Town at a later time."

Sarah Roy is a patient access supervisor at Boys Town Research Hospital. Roy was asked if Andrew told anyone not to put Lisa's name on the patient's chart. She said, "I can't answer that just because I was not up front at the time," but "typically, when we have a patient checking in, we will ask for -- will verify . . . the information" and "[w]e'll ask if there is another parent that they would like on the chart and whether they answer yes or no is then how we move forward."

Roy also stated, "Typically, if we see only one parent on the chart but then another [biological] parent brings that child in, we will then ask if they would like to be added to the chart," and then "we can go ahead and just add them to the chart." Roy confirmed that is what happened in this case. Roy said that exhibit 171 was a "snip of the patient's basic information from their chart," and Roy had written at the bottom that the mother's information was not included on the patient's chart as of April 19, 2023, but upon finding this, adjustments were made to include Lisa as a patient contact. Roy stated that Lisa asked her to make the note that she had not been included on the chart.

Andrew testified that he did not recall what information he put on the Boys Town forms. When asked if it was fair to say that it was an oversight if he did not include Lisa's name, Andrew responded, "Yes."

### (c) District Court's Order

The district court discussed its findings at the conclusion of the hearing; we will reference some of those findings in our analysis below. The court entered its "Order on Contempt" on August 24, 2023. It stated that Andrew was in willful and contumacious contempt of court for failing to notify Lisa of the meeting with the child's principal regarding a behavioral issue with the minor child, failing to abide by the transportation order from the stipulated decree, and failing to list Lisa as the biological mother in the records of Boys Town Medical. The court's "judgment and sentence" was that Andrew "shall pay $300 toward [Lisa's] attorney fees no later than August 25." The court also found that it was "necessary to amend the transportation clause in the stipulated decree in order to avoid future conflict and considering the best interests of the minor child." "The amendment to the transportation order is contained in a separate order."

In a separate order entered on August 25, 2023, the district court stated that the parties' parenting plan incorporated as part of the order to modify filed on January 23, 2023, shall be amended as it relates to transportation, and the transportation provision shall now read as follows: "E. TRANSPORTATION: For regular and holiday parenting time, the parent ending their time shall be responsible for transportation."

Lisa appeals from both the "Order on Contempt" entered on August 24, 2023, and the order regarding transportation entered on August 25.

### III. ASSIGNMENTS OF ERROR

In case No. A-23-745, Lisa assigns, restated, that the district court erred when it found that Andrew was not in contempt for (1) refusing to take the minor child to church or allowing her to do so, (2) signing the child up for summertime activities without her prior knowledge or consent, and (3) ordering Andrew to pay only $300 towards her attorney fees.

In case No. A-23-746, Lisa assigns, restated, that the district court erred in modifying the transportation provision contained in the modification order.

### IV. STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

Whether relief entered in a proceeding to enforce a parent's rights is reasonably necessary to enforce such rights is reviewed for an abuse of discretion. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020).

### V. ANALYSIS

#### 1. CONTEMPT FINDINGS

Lisa's first two assigned errors in case No. A-23-745 challenge the district court's failure to find that Andrew was in contempt for (1) refusing to take the minor child to church or allowing Lisa to do so, and (2) signing the child up for summertime activities without Lisa's prior knowledge or consent.

#### (a) General Principles of Law

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. See, *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012); *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh, supra.* Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Hossaini v. Vaelizadeh, supra.* Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. See *Smeal Fire Apparatus Co. v. Kreikemeier, supra.*

#### (b) Church

Lisa claims the district court erred when it found Andrew was not in contempt for refusing to take the minor child to church or allowing her to do so. Pursuant to the 2023 modification order, Lisa was awarded "sole legal custody regarding religion and extracurricular activities that involve music or non-sport activities." The modification order also stated that "[b]oth parties shall allow

and assist the minor child in participating in activities regardless of who the child is with at the time of such activities, practices, appointments, etc."

Andrew did not take the parties' son to church on Sundays during his parenting time. Andrew acknowledged that Lisa has legal custody as to religion but said that he did not consider church "an activity."

At the contempt hearing, the district court stated, "The way that the parties have been operating under, even before the order of modification was entered, and clearly since the order of modification is entered, is that [the child] doesn't go to church when it's dad's parenting time on Sunday." The court said it "[did not] find that Andrew was in contempt of the order of modification because he didn't take [the child] to church on Sundays" "[b]ecause that's . . . something that has been going on for quite some time."

The district court also found that "church is not an activity." The court pointed out that Andrew has legal custody as to education and Lisa has legal custody as "to church," and therefore, Lisa cannot "come in and change what school the child goes to," "just like [Andrew] couldn't come in and change what church [the child] goes to[.]" When Lisa's counsel questioned whether Lisa had to take the child to weekend football practice on her weekends, the court responded she did have to take him because "[h]ow is a kid going to participate on a team if he only goes to a third of the practices? No coach is going to put up with that." The court added, "So this is all about being a common-sense parent, that you want to . . . provide support for your child to do the things that he enjoys doing."

Lisa argues that the district court acted as a "quasi-witness" and relied on its own memory of evidence received at the earlier modification trial to reason that the child had not attended church while in Andrew's care even before the modification. Brief for appellant at 18. In response, Andrew contends that the court was well within its discretion to consider the history of this case and weigh the testimony and evidence contained in the court file. Andrew also argues that Lisa "is attempting to expand the choice of religion for the minor child to also include usurping parenting time under the veil of a 'religious activity.'" Brief for appellee at 6.

Given the language in the modification order and parenting plan as set forth previously, the district court did not clearly err by finding that regular attendance at church was not an activity as contemplated in the modification order and parenting plan. See *Hossaini v. Vaelizadeh* (trial court's factual findings reviewed for clear error). See, also, *Gomez v. Gomez*, 303 Neb. 539, 930 N.W.2d 515 (2019) (stipulated parenting plan requiring children be enrolled and be participants in Catholic religion did not compel children's attendance at Catholic Mass; parenting plan set forth several specific Catholic religious activities in which children would participate, but Mass not mentioned). Thus, there was no abuse of discretion by the court in determining that Andrew was not in contempt for failing to take the child to church on Sundays during his parenting time. *Id*. (trial court's determinations of whether party is in contempt reviewed for abuse of discretion).

That said, we reiterate the district court's comments to the parties that there are "going to be schedule issues that are going to clash," and that as the child gets older, the hope is that "both parents listen to what [the child] would like." The court suggested that if the parties' son preferred going to football practice over church on Wednesday evenings, then Lisa should be willing to take him to football practice; or if their son wanted to go to church during Andrew's Sunday parenting time, then Andrew should get him to church. The court cautioned the parties that their son "will

grow to resent" "whichever parent is denying him what he would want," in terms of these types of choices. Ideally, both parents should strive to promote their son's best interests, and to eliminate or at least minimize the conflicts between them.

(c) Kids Club

Lisa claims the district court erred when it found that Andrew was not in contempt for signing the child up for summertime activities without her prior knowledge or consent. As stated previously, pursuant to the modification order, Lisa was awarded sole legal custody over non-sport extracurricular activities.

Andrew explained that Kids Club was a daycare that the parties' son attended during Andrew's parenting time. Upon questioning by the district court, Lisa agreed that the Kids Club was located at the school. At the contempt hearing, the district court stated that Andrew was not in contempt for signing the parties' son up for non-sport activities because "Ashbury Kids Club is, essentially, like a daycare. . . . a before and after school program." The court did not find that there was "anything intentional" or that Andrew was "trying to usurp [Lisa's] legal custody with regard to non-sport activities."

We find no abuse of discretion in the district court's determination that Andrew was not in contempt regarding the child's activities through Kids Club. The activities were essentially daycare field trips. There was no "willful" violation of the provision giving Lisa sole legal custody over non-sport extracurricular activities.

2. ATTORNEY FEES

Lisa also claims in case No. A-23-745 that the district court erred when it ordered Andrew to pay only $300 towards her attorney fees in the contempt action.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Specific to contempt proceedings in domestic relations actions, Neb. Rev. Stat. § 42-370 (Reissue 2016) provides that "[c]osts, including a reasonable attorney's fee, may be taxed against a party found to be in contempt." Additionally, Neb. Rev. Stat. § 42-364.15 (Reissue 2016) provides for "reasonable attorney's fees" to be taxed against a parent found in contempt in the enforcement of orders relating to "parenting time, visitation, or other access" with a minor child.

At the hearing, Lisa requested that Andrew be ordered to pay the entire $4,442.61 in attorney fees and expenses she incurred in the contempt action. Her attorney also requested that if Andrew was found in contempt, the purge plan include "the threat of a jail sentence" should he violate the order again. Andrew's attorney noted that some of the contempt issues indirectly related to issues on the appeal that was currently pending, and counsel requested that "any purge plan be held in abeyance until the mandate comes back." Andrew's attorney noted that the district court directed Andrew as to what the expectations were, and counsel believed that the reprimand the court gave to both parties would be sufficient.

The district court found that Andrew was in willful and contumacious contempt of court for failing to notify Lisa of a meeting with the child's principal regarding a behavioral issue with the minor child, failing to abide by the transportation order from the stipulated decree, and failing

- 10 -

to list Lisa as the biological mother in the records of Boys Town Medical. It did not find him in contempt as to the other matters discussed in this opinion. The court ordered Andrew to pay $300 towards Lisa's attorney fees by a specified day that same week.

Lisa argues that the $300 attorney fee was unreasonable given the costs she incurred to bring the contempt action. Further, such amount was "trivial and really more of an invitation to continue to violate the Court's order." Brief for appellant at 20. Lisa further asks this court to consider that the district court never admonished Andrew and set no purge plan so that there would be obvious consequences.

At the contempt hearing, the district court told Andrew that it was his responsibility to make sure Lisa was listed as the biological mother on medical forms, and that he needed to notify her of meetings at school that involved the child. The court also found those issues could be "easily remedied." Further, the court encouraged both parties to put their son's interests before their own and cautioned them both that their son would come to resent them if they failed to put his needs first. Thus, the court did admonish Andrew and let him know the court's expectation going forward. Under the circumstances of this case, we cannot say that the district court abused its discretion when it ordered Andrew to pay $300 towards Lisa's attorney fees.

### 3. TRANSPORTATION AMENDMENT

In A-23-746, Lisa assigns that the district court erred when it "clarified" the transportation order "to avoid any further conflict." She argues the transportation order was already clear, and "[t]he only 'problem' with the order was [Andrew's] failure to abide by it." Brief for appellant at 8.

Pursuant to the parenting plan attached to the January 2023 modification order, Andrew was to have parenting time "every Monday when the child is dropped off at school, or 9 a.m. until Wednesday when the child is dropped off at school or 9 a.m." Lisa was to have parenting time "every Wednesday when the child is dropped off at school, or 9 a.m. until Friday when the child is dropped off at school or 9 a.m." The parties had alternate weekends "starting on Friday when the child is dropped off at school, or 9 a.m. until Monday when the child is dropped off at school or 9 a.m." The parenting plan also stated, "Transportation will be provided by Defendant Dad."

At the contempt hearing, Lisa's position appeared to be that following her weekend of parenting time with the child, which concluded on Monday morning "when the child is dropped off at school, or 9 a.m.," the transportation provision meant that on school days, Andrew had to drive to her home to pick up their son to take him to school which started at 8 a.m. Andrew's position appeared to be that the parenting time provision meant that if the Monday following Lisa's weekend parenting time was a school day, then Lisa would drop their son off at school. The same problem would exist on Friday mornings as well. Andrew acknowledged that the transportation provision caused some confusion between him and Lisa.

In discussing this issue in the courtroom after the close of the contempt hearing, the district court pointed out that the parties had not addressed transportation at the modification trial and that it made sense "that if it is one parent's parenting time and their parenting time is coming to an end, that that is the parent who then transports the child either to school, daycare, or to the other parent." Nevertheless, the court found that Andrew was in contempt regarding transportation because "there's no wiggle room as far as transportation." However, the court wanted to find a solution to

reduce further problems, and it was "looking for a little bit of guidance on what makes sense for both of the parties as far as the visitation and transportation issue." It stated:

> I recognize [Lisa] is choosing certain parts of the decree to read . . . without any bend to it. So as far as wanting [Andrew] to be held in contempt for not doing some of the transportation. . . .
>
> So, I mean, I'm clearly looking for a reason that the parties see each other the least amount as possible. And to me it makes sense that if it is one parent's parenting time and their parenting time is coming to an end, that that is the parent who then transports the child either to school, daycare, or the other parent.

After hearing from both attorneys, the court did not have confidence they would be able to come up with something agreeable to their clients. The court said, "if we can't reach any kind of an agreement here, then . . . I have the ability to change that to cut down on further conflict between the parents which directly affects the child." The court found that it was in the child's best interest to change the transportation provision so that the parent ending their parenting time will drop the child off at school, or if school is not in session, then the parent will drop the child off at daycare or the other parent's residence at 9 a.m. "so that that is consistent with what is in the order of modification regarding regular parenting time."

The district court's subsequent written order states the parties' parenting plan incorporated as part of the order to modify filed on January 23, 2023, shall be amended as it relates to transportation, and the transportation provision shall now read as follows: "E. TRANSPORTATION: For regular and holiday parenting time, the parent ending their time shall be responsible for transportation."

On appeal, Lisa contends that the original transportation order was clear in that Andrew was to provide "all transportation." Brief for appellant at 10. While this is true, the district court had the authority to modify the previous order in its attempt to reduce conflict between the parties. Section 42-364.15 provides in relevant part:

> In any proceeding when a court has ordered a parent to pay, temporarily or permanently, any amount for the support of a minor child and in the same proceeding has ordered parenting time, visitation, or other access with any minor child on behalf of such parent, the court shall enforce its orders as follows:
>
> (1) Upon the filing of a motion which is accompanied by an affidavit stating that either parent has unreasonably withheld or interfered with the exercise of the court order after notice to the parent and hearing, the court shall enter such orders as are reasonably necessary to enforce rights of either parent including the modification of previous court orders relating to parenting time, visitation, or other access. . . .

We also observe that, generally, once an appeal has been perfected, the trial court no longer has jurisdiction. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020). Lisa's contempt action was filed while the appeal in case No. A-23-111 was pending. However, under Neb. Rev. Stat. § 42-351(2) (Reissue 2016), a trial court retains jurisdiction in certain matters. See *Yori v. Helms, supra*. Section 42-351(2) provides:

When final orders relating to proceedings governed by sections 42-347 to 42-381 [domestic relations actions] are on appeal and such appeal is pending, the court that issued such orders shall retain jurisdiction to provide for such orders regarding support, custody, parenting time, visitation, or other access . . . or other appropriate orders in aid of the appeal process. Such orders shall not be construed to prejudice any party on appeal.

However, there is a limit on a trial court's jurisdiction to modify a decree concerning an issue which is pending appeal. *Burns v. Burns*, 293 Neb. 633, 879 N.W.2d 375 (2016). Section 42-351(2) does not grant a trial court authority to hear and determine anew the very issues then pending on appeal and to enter permanent orders addressing these issues during the appeal process. *Burns v. Burns, supra*. In this case, the district court only modified the transportation provision contained in the January 2023 modification order. None of the issues raised on appeal from that modification order related to transportation. See *Masters v. Masters*, case No. A-23-111, 2024 WL 160117 (Neb. App. Jan. 16, 2024) (selected for posting to court website) (petition for further review denied March 28, 2024). Therefore, the district court retained jurisdiction over the case pursuant to § 42-351(2) while the appeal in case No. A-23-111 was pending. It also had the authority, pursuant to § 42-364.15, to modify the transportation provision contained in its prior modification order.

The district court, recognizing that Lisa was choosing certain parts of the decree to read "without any bend to it," was looking for a solution where the parties see each other the least amount as possible and that would cut down on further conflict between them. The court's order resolves the transportation conflict/confusion, with the added benefit of minimizing the frequency of contact between these parties. We find no abuse of discretion.

Lisa's argument that "it will not help the parties get in the mood for cooperation" if she is "forced to deliver her child to [Andrew's] wife for 'daycare' when [Lisa] could well provide the necessary care herself," brief for appellant at 10, is essentially a "right of first refusal" argument. However, a "right of first refusal" is not contained in the January 2023 modification order or parenting plan and was not raised in the contempt pleading filed with the district court.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's "Order on Contempt" entered on August 24, 2023, and the order modifying the parties' transportation obligations entered on August 25.

AFFIRMED.